NOT DESIGNATED FOR PUBLICATION

No. 116,019

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

MARK L. MORALES,
*Appellee*,

v.

TRANSWOOD, INC.,
and
SPARTA INSURANCE COMPANY,
*Appellants*.

MEMORANDUM OPINION

Appeal from Workers Compensation Board. Opinion filed May 5, 2017. Affirmed.

*Thomas G. Munsell* and *Alisa R. Walker*, of Morrow, Willnauer, Klosterman, Church, LLC, of Kansas City, Missouri, for appellants.

*William L. Phalen*, of Pittsburg, for appellee.

Before GREEN, P.J., STANDRIDGE and GARDNER, JJ.

*Per Curiam*:  Transwood Incorporated and Sparta Insurance Company (collectively Transwood) appeal from a Workers Compensation Board (Board) decision relating to a claim resulting from a work-related injury to Transwood's employee, Mark L. Morales. Morales was diagnosed with Reactive Airway Dysfunction Syndrome (RADS) after inhaling irritants while working for Transwood. Morales was examined by Dr. Harold Barkman and Dr. Brent Koprivica. Each doctor provided Morales with a functional impairment rating and task loss rating. An administrative law judge issued an

1

award regarding Morales' injury. The Board altered the award and ordered Transwood to compensate Morales for his work-related injury.

Transwood appeals from the Board's award. Specifically, Transwood argues (1) that the Board erred as a matter of law in calculating Morales' task loss in the absence of permanent physical restrictions on Morales and, alternatively, if task loss were appropriate in this case, the Board improperly considered environmental risks; (2) that the Board erred as a matter of law in considering the opinions of Dr. Brent Koprivica because he did not comply with the fourth edition of the American Medical Association Guides to the Evaluation of Permanent Impairment (the Guides); (3) that the Board erred as a matter of law when it awarded Morales the payment of unauthorized medical expenses above $500; and (4) that the Board erred as a matter of law when it awarded Morales payment for a medical bill from Saint Luke's Health System (Saint Luke's) because Morales did not meet his burden of proof regarding the bill and the Board's finding was not supported by substantial competent evidence. On all issues, we hold in Morales' favor. Accordingly, we affirm.

Mark L. Morales is 52 years old and lives in Chanute, Kansas. In 2010, Morales, a high school graduate with no postsecondary education, completed a program with the Swift Garvey Academy and obtained his commercial driver's license.

In May 2012 Morales began working for Transwood Carriers, Inc., in Chanute, Kansas, hauling large loads of pulverized dry cement to customers throughout the surrounding region. Morales would pick up a load of pulverized cement at the local cement plant in Chanute and travel 3-4 hours to delivery sites. Once at the delivery sites, Morales would unload the cement and return to Chanute.

In his job with Transwood, Morales was continuously exposed to cement dust. He maintained that the cement dust was "everywhere"—in his truck's air conditioning vents,

seats, cab, and doors; in his hair; and on his clothes. Additionally, while unloading the cement at delivery sites, Morales was required to stand outside the cab of the truck in a "cloud of cement" during the unloading process.

Morales was not provided any type of mask by Transwood. He was given a paper mask by workers at a Chanute cement plant, Ash Grove Cement. Morales wore the mask "religiously." Even with the mask, though, Morales could taste the cement dust and feel himself breathing it into his lungs. Morales was concerned about the cement dust, so he purchased an air regulator for his protection. Even with the air regulator, he could still smell and taste the cement dust.

Sometime around September 24, 2012, Morales began to develop breathing problems. He found himself coughing up phlegm. He told Transwood that he was going to see a doctor. Morales' doctor told him that his problems were work related. Morales and Transwood disagreed over whether Morales was entitled to medical care for his breathing troubles.

On December 12, 2012, Administrative Law Judge Bruce E. Moore (ALJ Moore) ordered Transwood to provide medical care for Morales. The order stated that if Transwood refused to provide the names of two qualified treating physicians for Morales to choose from, Dr. Monisha Das would be designated as the authorized treating physician. Transwood was also ordered to pay Morales' medical expenses and provide temporary total disability payments to Morales until he was released to return to work.

Transwood supplied a list of two physicians for treatment, and Morales chose Dr. Harold Barkman as his treating physician. Dr. Barkman is a board-certified pulmonary and internal medicine specialist at The University of Kansas Hospital, in Kansas City, Kansas. In early 2013, Dr. Barkman diagnosed Morales with RADS, an asthma-like condition spurred on by exposure to an irritating compound found in the environment.

Dr. Barkman determined that Morales' RADS was caused by exposure to Portland cement and Duraplus while working for Transwood. Specifically, Dr. Barkman found that Morales' work accident on September 24, 2012, was the prevailing factor causing his RADS. As a result, Dr. Barkman restricted Morales from being in environments that exacerbated his symptoms. He did not, however, place any physical restrictions on Morales.

Dr. Barkman determined that Morales had suffered a 9% whole body functional impairment as a result of his RADS. This impairment was based on Morales' ability to breathe while he was on medication. Initially, Dr. Barkman found that Morales suffered 100% task loss, based on the list of 17 tasks developed by vocational expert Karen Terrill. But Dr. Barkman also opined that Morales would be able to perform 14 of the 17 tasks if he were working in an environment with suitable air quality.

Morales also went to see an independent medical examiner, Dr. Brent Koprivica. Dr. Koprivica is board-certified in occupational medicine. Additionally, Dr. Koprivica is a member of the American Academy of Disability Evaluating Physicians and is certified by the American Board of Independent Medical Examiners.

On February 26, 2014, Morales was examined by Dr. Koprivica. Dr. Koprivica diagnosed Morales with RADS, with the prevailing factor being his exposure to cement dust in his work for Transwood. Dr. Koprivica determined that Morales had suffered a 35% whole body functional impairment as a result of his RADS. Based on the task list developed by Karen Terrill, Dr. Koprivica determined that Morales had suffered a 100% task loss. Dr. Koprivica based his findings on tests that Dr. Barkman performed in 2012. Dr. Koprivica did not perform any tests on Morales on February 26 because Morales was ill and having trouble breathing. Dr. Koprivica acknowledged that the tests his opinion was based on were performed before Morales had received treatment. Dr. Koprivica also

4

acknowledged that Morales' function may have improved since those tests were performed.

On April 8, 2015, a regular hearing was held before ALJ Moore. ALJ Moore recorded the parties' issues and set terminal dates for briefing. On December 18, 2015, ALJ Moore rendered his award decision. ALJ Moore found that, giving equal weight to the opinions of Dr. Barkman and Dr. Koprivica, Morales suffered a 23% whole body functional impairment. ALJ Moore averaged Dr. Barkman's and Dr. Koprivica's task loss opinions and found that Morales had suffered 70.5% task loss. ALJ Moore then averaged Morales' task loss of 70.5% with his wage loss of 43% and determined that he had suffered a permanent partial work disability of 56.75% (this determination was based on faulty math and is addressed by the Board's award below). ALJ Moore awarded Morales

"47.00 weeks of temporary total disability compensation at the rate of $468.24 per week or $22,007.28 followed by 217.35 weeks of permanent partial disability compensation (less the 10 weeks he was at comparable wage), at the rate of $468.24 per week or $92,089.56 for a 56.75% work disability, making a total award of $119,096.84."

Morales was also awarded payment of medical expenses, authorized and unauthorized. One of his unpaid medical bills resulted from a March 11, 2014, trip to the Neosho Memorial Regional Medical Center emergency room. That unpaid bill was in the amount of $2,233.59. Another unpaid medical bill was from Saint Luke's in the amount of $292. In awarding such payment, ALJ Moore noted that

"[t]hroughout the pendency of this claim, Morales has encountered difficulties with Sparta Insurance Company's adjustors[,] who have repeatedly refused to authorize prescriptions or pay medical bills. The medical expenses incurred with Dr. Barkman at Kansas University Medical Center and Neosho Memorial Regional Medical Center, along with medical mileage to and from treatment at those institutions, remain unpaid.

5

Morales has often had to live without his medication, as Sparta refused to pay for prescriptions.

> "[Transwood] has been remiss in providing, or paying for, Morales' treatment, medical mileage and prescriptions necessary to manage his [RADs] symptoms. All of those medical expenses identified in Morales['] evidentiary deposition are ordered paid *as authorized medical expenses*." (Emphasis added.)

Transwood applied for review of the award by the Board. On review, the Board determined that Morales' permanent functional whole body impairment was 22%. The Board determined that ALJ Moore had erred in using Dr. Barkman's task loss finding based on performing the tasks in a "clean environment." Thus, the Board only used Dr. Barkman's initial task loss finding of 100%. The Board then calculated Morales' work disability by averaging Morales' 43% wage loss and his 100% task loss, determining that his work disability was actually 71.5% and not 56.75%. Thus, the Board affirmed ALJ Moore's award except for that it raised Morales' work disability from 56.75% to 71.5%.

*Did the Board Err in Assessing Morales' Task Loss?*

Transwood argues that the Board erred as a matter of law in assessing Morales a 100% task loss because (1) neither examining doctor assessed any permanent physical restrictions; and (2) the Board's order impermissibly expands the definition of task loss beyond the provisions of the Act by including environmental risk in the definition of "work tasks." Transwood takes issue with the fact that both Dr. Barkman and Dr. Koprivica assigned Morales 100% task loss, even though neither doctor assigned him any physical restrictions during their examinations. Instead, the doctors assigned Morales a 100% task loss because he would not be able to perform his work tasks in an environment that causes his RADS to flare up.

6

Both arguments rely on the premise that the Board has erroneously interpreted or applied the law and thus may be reviewed under K.S.A. 2016 Supp. 77-621(c)(4).

*General Standard of Review*

Final orders of the Board are subject to review under the Kansas Judicial Review Act (KJRA), K.S.A. 77-601 *et seq.*, as amended. K.S.A. 2016 Supp. 44-556(a). The standard of review applicable to specific questions arising out of Board decisions varies. K.S.A. 2016 Supp. 77-621(c) of the KJRA states that the court shall grant relief only if it determines that one or more of the following has occurred:

> "(1)     The agency action, or the statute or rule and regulation on which the agency action is based, is unconstitutional on its face or as applied;
> "(2)     the agency has acted beyond the jurisdiction conferred by any provision of law;
> "(3)     the agency has not decided an issue requiring resolution;
> "(4)     the agency has erroneously interpreted or applied the law;
> "(5)     the agency has engaged in an unlawful procedure or has failed to follow prescribed procedure;
> "(6)     the persons taking the agency action were improperly constituted as a decision-making body or subject to disqualification;
> "(7)     the agency action is based on a determination of fact, made or implied by the agency, that is not supported to the appropriate standard of proof by evidence that is substantial when viewed in light of the record as a whole, which includes the agency record for judicial review, supplemented by any additional evidence received by the court under this act; or
> "(8)     the agency action is otherwise unreasonable, arbitrary or capricious."

Questions arising out of the Workers Compensation Act (the Act) often center on statutory interpretation. Appellate courts have unlimited review of questions regarding the interpretation and construction of a statute and owe no deference to the Board's interpretation or construction of the same. *Fernandez v. McDonald's*, 296 Kan. 472, 475,

292 P.3d 311 (2013). The most fundamental rule of statutory interpretation is that the intent of the legislature should be given effect if it can be ascertained. *State ex rel. Schmidt v. City of Wichita*, 303 Kan. 650, 659, 367 P.3d 282 (2016). An appellate court must first attempt to find the legislature's intent by examining the language of the statute, giving common words their ordinary meaning. *Ullery v. Othick*, 304 Kan. 405, 409, 372 P.3d 1135 (2016). "When a workers compensation statute is plain and unambiguous, this court must give effect to its express language rather than determine what the law should or should not be. The court will not speculate on legislative intent and will not read the statute to add something not readily found in it." *Bergstrom v. Spears Manufacturing Co.*, 289 Kan. 605, 607-08, 214 P.3d 676 (2009).

Other questions often arise regarding the Board's findings of fact. Under K.S.A. 2016 Supp. 77-621(c)(7), this court reviews a challenge to those factual findings in light of the record as a whole to determine whether they are supported to the appropriate standard of proof by substantial evidence. "[I]n light of the record as a whole" is statutorily defined as meaning:

> "that the adequacy of the evidence in the record before the court to support a particular finding of fact shall be judged in light of all the relevant evidence in the record cited by any party that detracts from such finding as well as all of the relevant evidence in the record, compiled pursuant to K.S.A. 77-620, and amendments thereto, cited by any party that supports such finding, including any determinations of veracity by the presiding officer who personally observed the demeanor of the witness and the agency's explanation of why the relevant evidence in the record supports its material findings of fact. In reviewing the evidence in light of the record as a whole, the court shall not reweigh the evidence or engage in de novo review." K.S.A. 2016 Supp. 77-621(d).

"Substantial evidence" means evidence possessing adequate substance and relevant consequence to induce the conclusion that the Board's action was proper, providing a

basis of fact from which the disputed issue could be easily resolved. *Rogers v. ALT-A&M JV*, 52 Kan. App. 2d 213, 216, 364 P.3d 1206 (2015).

Transwood's arguments require us to interpret the Act as it relates to task loss. This Act defines task loss as

> "the percentage to which the employee, in the opinion of a licensed physician, has lost the ability to perform the work tasks that the employee performed in any substantial gainful employment during the five-year-period preceding the injury. The permanent restrictions imposed by a licensed physician as a result of the work injury shall be used to determine those work tasks which the employee has lost the ability to perform." K.S.A. 2016 Supp. 44-510e(a)(2)(D).

Transwood argues that *Mikesell v. Keim TS, Inc.*, No. 107,101, 2012 WL 3290018 (Kan. App. 2012) (unpublished opinion), supports its assertion that an individual cannot be assessed task loss if he or she has not been given *physical* restrictions. Transwood supports his argument with this quote from *Mikesell*: "[I]f there are no physical restrictions applied, then the injured worker can still perform the previous physical job tasks and has no task loss." 2012 WL 3290018, at *2. We must note, though, that the quote from *Mikesell* is not the language of the court—it is from the Board's underlying award from which the claimant was appealing. As we mentioned before, we owe no deference to the Board's interpretation or construction of a statute. Thus, Transwood's assertion that "[t]his Court stated that physical restrictions are necessary for task loss to be appropriate" is a blatant mischaracterization of *Mikesell*. This court has never held that the assessment of *physical* restrictions is a condition precedent to a determination of task loss. Moreover, in *Mikesell*, the doctor's task loss opinion was ultimately disregarded by the court because the doctor failed to comply with an entirely different section of the statute. As Morales points out, *Mikesell* did not involve any interpretation of K.S.A. 44-510e(a)(2)(D) and its amendments, specifically. Thus, contrary to Transwood's assertion, *Mikesell* bears little to no weight regarding this present appeal.

9

Morales, on the other hand, argues that the plain language of K.S.A. 2016 Supp. 44-510e(a)(2)(D) supports the Board's task loss assessment. Morales asserts that nothing in the statute requires "permanent restrictions" to be read as "physical permanent restrictions." Morales argues that reading "physical" into the statute would run contrary to our Supreme Court's clear mandate from *Bergstrom*, that this court will not read something into a statute that is not readily found in its plain language. 289 Kan. at 607-08.

The statute here plainly says that in determining an individual's task loss, "[t]he *permanent restrictions* imposed by a licensed physician as a result of the work injury shall be used to determine those work tasks which the employee has lost the ability to perform." (Emphasis added.) K.S.A. 2016 Supp. 44-510e(a)(2)(D). Here, both Dr. Barkman and Dr. Koprivica stated in their depositions that they restricted Morales from being in environments that caused his RADS to act up. Based on the plain reading of the statute and the treating and examining doctors' deposition testimonies, it seems clear that Morales was on "permanent restrictions" as the statute calls for. Thus, even though the most common type of permanent restriction may be physical, it is not necessary that restrictions be physical to find an individual has suffered task loss.

Transwood hedges its argument, asserting that even if some task loss is appropriate, the Board overstated Morales' task loss and expanded the definition of task loss beyond the provisions of the Act by including environmental and positional risk in the definition of work tasks. Transwood asserts that "the record clearly indicates that Morales was physically able to work without difficulty in a clean air environment." Transwood further asserts that "[t]he definitive factor in the assessment of task loss is Morales' ability to perform a task, not where the task is to be performed." Transwood's argument is partly based on Dr. Barkman's opinion that Morales could perform 14 out of the 17 work tasks identified by the vocational rehabilitation expert so long as the tasks

10

were performed in a "clean air environment." Transwood points out that Morales held a job in a warehouse in which he disassembled industrial shelving without issue.

Transwood presents a hypothetical which it claims shows that the Board's interpretation of the Act is overbroad. Transwood states that assessing Morales' task loss based on environmental factors would be the same as finding that an individual stocking the shelves at a pet store has a 100% task loss after he or she develops an allergy to the cats sold in the store, even though the individual could perform all of the same physical tasks in an environment where no cats were sold. But this hypothetical downplays the severity of Morales' injury in its attempt to compare RADS with common allergies, which are easily treatable with over-the-counter medications. Moreover, this hypothetical downplays Transwood's own role in the development of Morales' injury. For example, Dr. Barkman stated that Morales' RADS condition was directly caused by Morales' inhaling and his handling of Portland Cement and Duraplus. But under Transwood's hypothetical, the employee did not develop an allergy to cats as a direct result from handling or working with the cats. Indeed, the employee's job duties were stocking the shelves at the pet store. This is a significant difference from Morales' situation. As a result, Transwood's hypothetical is flawed.

We turn now to the meaning of task loss as used in K.S.A. 2016 Supp. 44-510e(a)(2)(D). Morales argues that the plain language of K.S.A. 2016 Supp. 44-510e(a)(2)(D) covers environmental factors. Morales specifically argues that the Act covers environmental factors where it refers to work tasks *previously performed*. Morales argues that the environment in which the work tasks were performed is part of the task loss determination. Morales argues that the Board was correct when it stated that "[t]he proper and relevant question is not what claimant's task loss would be if the nature of his previous task is altered. The question is claimant's loss of the ability to perform the work tasks as they existed."

11

The question before us is a meaningful one—whether environmental factors may be properly considered by a physician making a task loss determination. A holding that environmental factors are *always* an appropriate consideration in determining task loss may result in a windfall for employees to the detriment of employers. Nevertheless, a holding that environmental factors are *never* an appropriate consideration in determining task loss would almost certainly result in a bar to recovery for some injured employees. Such a sensitive and consequential decision must be given special attention and made with care. Most importantly, we must take a pragmatic approach to the question at hand.

Morales was diagnosed with RADS by two different doctors. RADS is described as an asthma-like condition and is often referred to as "irritant-induced asthma." See *Merrill v. Georgia Pacific*, No. 113,996, 2016 WL 3202663, at *1 (Kan. App. 2016) (unpublished opinion). Thus, the environment in which individuals work is at least partially determinative of their ability to perform work tasks. Therefore, in Morales' case, or in the case of individuals with a significant respiratory disease, environmental factors are appropriate to consider in determining task loss.

For these reasons, the Board was correct in finding that Morales suffered a 100% task loss, and Dr. Barkman's opinion that Morales could perform 14 out of the 17 work tasks if he were in a "clean air environment" is inconsequential. Morales' injury is of the type that necessarily requires the consideration of environmental factors in determining his ability to perform previous work tasks. Such a holding does not impermissibly expand the definition of task loss beyond the plain language of the Workers Compensation Act.

*Did the Board Err in Considering Dr. Koprivica's Permanent Partial Disability Finding?*

Transwood argues that the Board erred as a matter of law in considering the functional impairment ratings of Dr. Koprivica. Transwood bases its argument on the fact that Dr. Koprivica used Dr. Barkman's previous test results to establish his own

functional impairment rating. Transwood asserts that this procedure was in violation of the fourth edition of the AMA Guides to the Evaluation of Permanent Impairment. Thus, Transwood asserts that the Board has erroneously interpreted or applied the law and thus may be reviewed under K.S.A. 2016 Supp. 77-621(c)(4).

Dr. Koprivica acknowledged in his deposition that he did not personally conduct any tests on Morales. He decided not to test Morales because Morales was ill when Dr. Koprivica examined him. Dr. Koprivica stated that he decided not to do so "[b]ecause of his acute illness and stated difficulties with the spirometry testing with Dr. Barkman." Instead, Dr. Koprivica decided to "rely on the more stable studies that are available during prior care and treatment." Thus, Dr. Koprivica used Dr. Barkman's test results to make his own functional impairment determination.

K.S.A. 2016 Supp. 44-510e(a)(2)(B) states that

"[t]he extent of permanent partial general disability shall be the percentage of functional impairment the employee sustained on account of the injury as established by competent medical evidence and based on the fourth edition of the American medical association guides to the evaluation of permanent impairment, if the impairment is contained therein, until January 1, 2015, but for injuries occurring on or after January 1, 2015, based on the sixth edition of the American medical association guides to the evaluation of permanent impairment, if the impairment is contained therein."

Our Supreme Court has held that "the Guides were designed to increase objectivity and uniformity when estimating impairments." *Redd v. Kansas Truck Center*, 291 Kan. 176, 196, 239 P.3d 66 (2010). There is no dispute that the fourth edition of the Guides controlled here.

Transwood first points to *Thompson v. U.S.D. No. 512*, No. 97,460, 2007 WL 2580530 (Kan. App. 2007) (unpublished opinion), to support its assertion that Dr.

13

Koprivica's opinion was improperly considered by the Board. In *Thompson*, this court affirmed the Board's decision to exclude a doctor's impairment rating after the doctor relied on a publication other than the fourth edition of the Guides to make his rating. 2007 WL 2580530, at *7. This court noted that if doctors were allowed to rely on publications other than the fourth edition of the Guides, there is "[n]o doubt evaluating physicians would seek a reference providing the most favorable rating for their patient or client." 2007 WL 2580530, at *6. The court stated that the Act "was clearly enacted to avoid just that and provide clear standards for calculating consistent impairment ratings." 2007 WL 2580530, at *6.

Transwood also relies on *Alaniz v. Dillon Companies Inc.*, No. 109,784, 2014 WL 3731939 (Kan. App. 2014) (unpublished opinion), in arguing that the Board should not have considered Dr. Koprivica's functional impairment opinion. In *Alaniz*, the Board did not consider one doctor's report because the doctor failed to identify which edition of the Guides he had relied on in forming his opinions. 2014 WL 3731939, at *7. But this court determined that the Board had erred in making such a determination. Instead, this court held that the doctor's opinion should have been considered because there was sufficient evidence to support a finding that the doctor's opinion on the claimant's functional impairment was based on the correct edition of the Guides. 2014 WL 3731939, at *7. Based on the issue and holding from *Alaniz* it is difficult to see what support, if any, it provides for Transwood's position.

Here, unlike *Thompson*, we do not have an issue as to which edition of the Guides Dr. Koprivica used in making his impairment rating. Also, unlike *Alaniz*, we do not have an issue as to whether Dr. Koprivica actually used the Guides in making his determination. Dr. Koprivica was very clear that he used the fourth edition of the Guides. The issue, then, is whether Dr. Koprivica complied with the specific instructions within the Guides in making his functional impairment determination. Thus, it would seem that we would be required to consult the Guides.

14

Morales argues, though, that we cannot consult the Guides because Transwood has failed to designate them in the record on appeal. Morales cites *Durham v. Cessna Aircraft Co.*, 24 Kan. App. 2d 334, 945 P.2d 8 (1997), to support his assertion that it would be improper for this court to consider the specific requirements of the Guides without the Guides having been first placed into evidence. In *Durham*, this court was faced with the following situation:

> "Claimant bases part of his argument on what the AMA Guidelines say about the finding of an impairment for pain. He attaches a copy of the applicable Guidelines to his brief. The problem is that these Guidelines were never introduced into evidence and are not part of the record on appeal. Claimant cannot cure this deficiency by attaching the Guidelines to his brief as an appendix. 'An appellant has the burden to designate a record sufficient to establish the claimed error. Without an adequate record, an appellant's claim of alleged error fails.' [Citation omitted.] Further: 'Assertions in an appellate brief are not sufficient to satisfy inadequacies in the record on appeal.' [Citation omitted.]" 24 Kan. App. 2d at 334-35.

After consideration, the court held that the record did not contain any "support for claimant's argument concerning the AMA standards." 24 Kan. App. 2d at 335.

But Transwood argues in its reply brief that the Guides are not necessary "because Dr. Koprivica admitted his examination did not follow the prescribed procedure set out in the Guides." Transwood reminds us of our warning in *Thompson* that allowing doctors to utilize publications other than the Guides would result in doctors shopping publications for the most favorable ratings. Transwood asserts that if we were to allow Dr. Koprivica's impairment rating to be utilized here, then we would open the door to doctors failing to perform the tests laid out in the Guides and opting instead to use previously existing test results that would offer higher impairment ratings.

The Board, however, noted that "[t]he doctor reasonably chose not to perform such a test under the circumstances, particularly when the medical records the doctor reviewed contained reports of previous pulmonary studies conducted when claimant's condition was more stable." Furthermore, the fact remains that here, as in *Durham*, the Guides were not introduced into evidence nor are they part of the record on appeal. Also, as in *Durham*, Transwood has attempted to make the Guides available by citing to them in its brief. But *Durham* makes clear that citing to the Guides in a brief will not be sufficient to cure their absence in the record. Thus, Morales is correct, and we will not entertain Transwood's argument that the Board improperly considered Dr. Koprivica's functional impairment rating.

Moreover, it is clear from our caselaw that the Guides are to be used to increase objectivity and eliminate partial practices resulting in disparate functional impairment ratings. See *Redd*, 291 Kan. at 196; *Thompson*, 2007 WL 2580530, at *6. Here, the record indicates that Dr. Koprivica relied on the test results from Dr. Barkman's prior testing, which Dr. Barkman performed in compliance with the fourth edition of the Guides. K.S.A. 2016 Supp. 44-510e(a)(2)(B) states that the functional impairment rating shall be "based on the fourth edition of the American medical association guides to the evaluation of permanent impairment." Thus, even though Dr. Koprivica did not perform the tests himself, his impairment rating was based on a test that was performed in compliance with the fourth edition Guides. Moreover, if he had performed the breathing tests on Morales while Morales was ill, the results would have likely resulted in a higher impairment rating based on Morales' poorer lung function. Therefore, Dr. Koprivica's functional impairment rating does not bear the indicia of partiality that would have precluded it from consideration by the Board.

*Did the Board Err in Ordering Transwood to Pay for Unauthorized Medical Treatment in Excess of $500?*

Transwood argues that the Board erred as a matter of law when it awarded Morales the payment of unauthorized medical bills in excess of $500. The bill in question is a result of Morales' visit to the Neosho Memorial Regional Medical Center Emergency Department on March 11, 2014. The visit cost a total of $2,233.59, which the Board ordered Transwood to pay. Transwood asserts that the Board has erroneously interpreted or applied the law and thus may be reviewed under K.S.A. 2016 Supp. 77-621(c)(4).

K.S.A. 2016 Supp. 44-510h(a) states that "[i]t shall be the duty of the employer to provide the services of a health care provider, and such medical, surgical and hospital treatment . . . as may be reasonably necessary to cure and relieve the employee from the effects of the injury." But K.S.A. 2016 Supp. 44-510h(b)(2) limits payment for unauthorized medical care to $500.

Transwood argues that the emergency room bill was the result of unauthorized medical care, and therefore, Morales was only entitled to payment in the amount of $500. Transwood points out that when Morales visited the emergency room he had already begun his authorized treatment with Dr. Barkman. Transwood relies on *Thompson v. Hasty Awards, Inc.*, No. 106,359, 2012 WL 1970241 (Kan. App. 2012) (unpublished opinion), in arguing that the Board erred as a matter of law.

In *Thompson*, this court overturned the Board's decision to award a claimant unauthorized medical expenses for emergency treatment. In making such a decision, we noted that the claimant was already being provided health care by her employer and that she had not made any allegations that the care being provided was inadequate. *Thompson*, 2012 WL 1970241, at *9.

In *Thompson* this court distinguished *Saylor v. Westar Energy, Inc.*, 292 Kan. 610, 256 P.3d 828 (2011), which Morales argues is more on point for the appeal at hand. In *Saylor*, our Supreme Court was tasked with answering whether Westar, the employer, was responsible for paying for the unauthorized medical treatment of Saylor, the employee. Saylor had undergone a knee-replacement surgery that was not authorized by Westar. The court looked to K.S.A. 44-510j(h) for guidance. K.S.A. 44-510j(h) states in part that

> "[i]f the employer has knowledge of the injury and refuses or neglects to reasonably provide the services of a health care provider required by this act, the employee may provide the same for such employee, and the employer shall be liable for such expenses subject to the regulations adopted by the director."

Ultimately, the court found that "the statute clearly conveys the message that if Westar knew that its employee was suffering from a work-related injury and refused or neglected to provide medical services to address that injury, the employee was permitted to provide his or her own doctor at Westar's expense." *Saylor*, 292 Kan. at 623. After the court confirmed that substantial competent evidence supported the Board's finding that Westar had knowledge of the employee's work-related injury, it held that Westar was liable for the bills associated with the employee's unauthorized medical treatment. *Saylor*, 292 Kan. at 623-24.

Here, the Board acknowledged in its award that Morales began authorized treatment with Dr. Barkman before the date of the emergency room visit. Specifically, Transwood was ordered to provide authorized medical care to Morales in a preliminary hearing order on December 13, 2012. In early 2013 Morales began receiving authorized treatment from Dr. Barkman. Even though the authorized medical treatment had begun, the Board awarded the emergency room bill to Morales because of Transwood's pattern of withholding treatment. The Board quoted ALJ Moore in its award:

18

"Throughout the pendency of this claim, Morales has encountered difficulties with Sparta Insurance Company's adjustors[,] who have repeatedly refused to authorize prescriptions or pay medical bills. The medical expenses incurred with Dr. Barkman at Kansas University Medical Center and Neosho Memorial Regional Medical Center, along with medical mileage to and from treatment at those institutions, remain unpaid. Morales has often had to live without his medication, as Sparta refused to pay for prescriptions."

ALJ Moore had also held:

"[Transwood] has been remiss in providing, or paying for, Morales' treatment, medical mileage and prescriptions necessary to manage his [RADs] symptoms. All of those medical expenses identified in Morales['] evidentiary deposition are ordered paid *as authorized medical expenses*." (Emphasis added.)

Thus, even though the Board does not specifically cite to K.S.A. 44-510j(h), it is clear that it is being applied to allow the Board to order Transwood to pay Morales' emergency room bills. There is no doubt that Transwood knew of Morales' injury when he sought the unauthorized medical treatment. There is also no doubt, based on the evidence in the record, that ALJ Moore was correct when he said that Transwood had "been remiss in providing, or paying for, Morales' treatment, medical mileage and prescriptions necessary to manage his [RADs] symptoms." For those reasons, the Board did not err as a matter of law when it awarded Morales compensation for the unauthorized medical bills associated with his March 11, 2014, emergency room visit.

*Did the Board Err in Ordering Transwood to Pay the Medical Bill to Saint Luke's Health System?*

Finally, Transwood argues that the Board erred as a matter of law when it ordered Transwood to pay the medical bill associated with Saint Luke's because Morales failed to meet his burden of proof under K.S.A. 2016 Supp. 44-501b(c). At the same time, Transwood argues that the Board's decision to award payment for the medical bill is not

19

supported by substantial competent evidence in the record. Thus, Transwood argues that the Board has erroneously interpreted or applied the law and that the Board's fact determination is not supported to the appropriate standard of proof; therefore, the arguments may be reviewed under K.S.A. 2016 Supp. 77-621(c)(4) and (7).

K.S.A. 2016 Supp. 44-501b(c) states that

"[t]he burden of proof shall be on the claimant to establish the claimant's right to an award of compensation and to prove the various conditions on which the claimant's right depends. In determining whether the claimant has satisfied this burden of proof, the trier of fact shall consider the whole record."

Additionally, K.S.A. 2016 Supp. 44-508(h) states that

"'[b]urden of proof' means the burden of a party to persuade the trier of facts by a preponderance of the credible evidence that such party's position on an issue is more probably true than not true on the basis of the whole record unless a higher burden of proof is specifically required by this act."

In determining questions of fact, this court is responsible for reviewing the record as a whole to determine whether the Board's factual determinations are supported by substantial competent evidence. The court will not reweigh the evidence or engage in de novo review. *Williams v. Petromark Drilling,* 299 Kan. 792, 795, 326 P.3d 1057 (2014).

Transwood first argues that the facts from *Roles v. The Boeing Co.*, 43 Kan. App. 2d 619, 230 P.3d 771 (2010), are directly on point regarding this issue. In *Roles*, the employee suffered from occupationally induced asthma. In September 2001, the employee filed an application for a preliminary hearing. The Board ultimately found that the employee's injury was compensable and ordered the employer to pay all of the reasonable and necessary medical expenses related to the employee's work injury. The

20

bills in question totaled $106,339.65. At the final award hearing regarding these bills, the employee failed to testify or introduce any evidence regarding the submitted medical bills or their relation to the employee's illness. Also, a doctor who independently evaluated the employee's medical records testified that certain medical expenses submitted for payment were actually unrelated to the employee's occupational injury. "As a result of the lack of conclusive evidence relating to the necessity and compensability of the submitted medical expenses, [the employer] objected to being ordered to pay such expenses." *Roles*, 43 Kan. App. 2d at 629. But even with the objection, the ALJ awarded the employee the medical expenses in question, which were later affirmed by the Board.

On appeal, this court reversed the Board's decision, noting that "[a]t every stage of the administrative proceedings in [the] case, the ALJ and the Board failed to require [the employee] to produce evidence of the compensability of medical expenses paid by [the employer] under the preliminary order." *Roles*, 43 Kan. App. 2d at 631. The court then found that "[b]ased on the final evidentiary record . . . [the employee] failed to meet her burden in proving the compensability of the expenses paid under the preliminary order." *Roles*, 43 Kan. App. 2d at 635. Thus, focusing on the lack of testimony and lack of evidence presented by the employee, the court reversed the award and found that the medical bills were not compensable. *Roles*, 43 Kan. App. 2d at 635.

Transwood argues that the facts of our current appeal "are practically identical" to those in *Roles*. Thus, Transwood asserts that it should not be ordered to pay the bill to Saint Luke's because Morales has failed to meet his burden of proof.

Transwood specifically argues that the only evidence in the record regarding the bill is Morales' testimony that all of the bills included in the itemization presented at his deposition are related to his work injury. The Saint Luke's bill was included in the itemization—but the document presented was not so much an itemization as it was a general compilation of unpaid medical bills. Transwood also asserts that "[t]he Saint

21

Luke's Health System bill was never specifically addressed and no direct testimony was provided regarding these charges."

At the preliminary hearing held December 12, 2012, the following exchange was had, with Morales' attorney asking the questions and Morales offering his answers:

"Q.     Now, did Dr. Parham recommend any further treatment for you?
"A.     Yes, sir, he had me see, wanted me to see a specialist, pulmonologist specialist.
"Q.     Did you see the pulmonary specialist?
"A.     Yes, sir, I did.
"Q.     The records indicate that was on or about November 30, 2012, in Kansas City at St. Luke's, is that correct?
"A.     Yes, sir.
"Q.     And did that doctor also given you to understand that you were suffering the effects of occupational asthma due to inhalation of concrete dust?
"A.     Yes, sir.
"Q.     And that doctor's name was Dr. Das D-A-S?
"A.     Yes, sir."

The exchange continued to detail the recommendations, prescriptions, and treatments offered by Dr. Das from Saint Luke's. It is abundantly clear that the treatment Morales received from Dr. Das at Saint Luke's was related to his work injury.

Transwood does not dispute that Morales went to see Dr. Das at Saint Luke's for his work injury. Instead, Transwood argues that even though it was established that Morales visited Dr. Das at Saint Luke's, "[n]ot only is there . . . no evidence in the record to indicate that the alleged charges are related to treatment rendered by Dr. Das, there is simply no evidence related to this alleged medical bill in the record at all."

In response to this same argument the Board noted that

22

"there is no dispute that claimant received treatment from Dr. Das, the only medical provider claimant saw associated with St. Luke's. Respondent is entitled to an itemization of the charges and invoice(s) of such charges shall be submitted by claimant's attorney to respondent's counsel for payment . . . if the treatment received by claimant related to his respiratory injuries in this claim."

The only true evidence in the record regarding the bill is a statement for payment from Saint Luke's in the amount of $292 dated July 5, 2013. During oral argument, both Morales and Transwood agreed that all medical bills had been paid by Transwood, including the $292 Saint Luke's medical bill. Morales asserted that the Saint Luke's medical bill for $292 had been paid under a previous order. Transwood did not challenge this assertion. As a result, we affirm the payment of this bill.

Affirmed.